Phillip S. Wise

Assistant Director (Retired), Federal Bureau of Prisons

140 Parham Rd. N.W.

Milledgeville, Georgia 31061

phone:  478.968.7907     cellphone:  478.456.4904   email:  pswise@msn.com

Reference:     Mr. Guillermo Sanchez


Prepared for:  Mr. Alexander Strassman, Esq.


I, PHILLIP S. WISE, declare:

1. From 1999 until my retirement in February 2002, I served as the Assistant
   Director of the Federal Bureau of Prisons, with responsibility for Health Care for
   the agency.  In this position, I was responsible for the formulation and
   implementation of health care policies for the agency, and served as a member of
   the Executive Staff which is the senior policy making body of the Bureau.  For
   three years prior to that, I was the Warden of the Federal Medical Center (of the
   Federal Bureau of Prisons) at Rochester, Minnesota, where I had overall
   operational responsibility for that facility.  While in this position, I was appointed
   to the Senior Executive Service of the U.S. Government.  For two years prior to
   that, I was the Warden of the Federal Prison Camp at Alderson, W.V.  My career
   with the Federal Bureau of Prisons dates back to 1977, and my assignments with
   the Bureau of Prisons include service in Federal Penitentiaries, Federal Prison
   Camps, Federal Medical Centers, and Federal Correctional Institutions.  I am fully
   familiar with the health care and inmate management policies of that organization.

From December 2003 through September 2005, I was employed as Vice President of a national firm that provides specialty medical care to inmates in federal and private correctional facilities.

Since my retirement from the Bureau of Prisons, I have maintained current knowledge of changes in its health care policies and practices through contact with current BOP officials; monitoring published changes in policy; review of reports and documents issued by BOP, the U.S. Department of Justice,  and outside agencies; review of testimony of BOP officials before oversight bodies as well as court testimony, and through request for information from the BOP through the Freedom of Information Act.

A copy of my resume which includes my relevant work experience is attached (Attachment 1)

2.   I was contacted by Mr. Strassman, counsel for Mr. Sanchez, who asked that I review documents related to the health care requirements of Mr. Sanchez and address issues related to incarceration. This statement is prepared in response to that request.

3.  In preparation of this statement, I have reviewed the following Program Statements of the Federal Bureau of Prisons: Inmate Security Designation and Custody Classification (September 12, 2006); Patient Care (6/13/2014), Medical Designations and Referral Services for Federal Prisoners (1/15/2005), Health Services Administration (6/2014), Pharmacy Services (1/15/2005); the National

Formulary of the Federal Bureau of Prisons for 2013/2014; Clinical Practice

Guidelines for the Management of Diabetes (2012); and the website for the

Federal Bureau of Prisons (www.bop.gov).  In addition, I reviewed medical

records from the Bureau of Prisons covering July 23, 2015 through August 28,

2015; letters from Jose Pinero, M.D. dated July 24, 2015 and August 17, 2015;

and a letter from Gilbert Concepcion, M.D. dated August 20, 2015.

4. From the information available to me, it appears that Mr. Sanchez is a 60 year old

individual who has been diagnosed with morbid obesity, hypertension,

hyperlipidemia, Type II diabetes, chronic obstructive pulmonary disease (COPD),

arteriosclerotic cardiovascular disease (having 7 stents in place), congestive heart

failure, cardiomegaly (enlarged heart), and gout.  Mr. Sanchez also has a history

of recurrent atrial fibrillation.  He is currently in the custody of the Bureau of

Prisons where he receives the following medications for those conditions:

Albuterol (for COPD); allopurinol (for gout); aspirin (for blood pressure);

atorvastatin (for lipids); carvedilol (for hypertension); clopidogrel (Plavix for

anticoagulation); furosemide (for hypertension); glipizide (substituted for

glimepiride for diabetes); lisinopril (substituted for enalapril for hypertension);

colchicine (for gout); nitroglycerin (for angina or heart failure); postassium

chloride (reason for prescription unclear, potassium levels within normal limits on

7/27/15); and propafenone (antiarrhythmic).  His physicians in the community

indicate that while one side (the left side) of his heart has been revascularized, the

other (right) side requires revascularization

5.  In my opinion, Mr. Sanchez and the Bureau of Prisons will face the following
    challenges while Mr. Sanchez is incarcerated:

> First, his medical requirements will limit the number of facilities available
> for designation for service of any sentence;
>
> Second, the program of care outlined by his physician may be delayed;
>
> Third, the scope of care and his access to medical specialists will be more
> limited than in the community; and
>
> Fourth, the management of chronic medical conditions is difficult in a
> correctional setting; and

My opinion is based on the following:


MEDICAL CLASSISFICATION

6.  The Bureau of Prisons now classifies its institutions based on the level of medical
    care each is capable of providing.  This classification is based in part on the
    resources available in the surrounding community and in part on the staffing of
    the medical component of that facility.  Each facility is assigned a care level (I-
    IV), with care level I providing the lowest level of medical care and generally
    housing "healthy" inmates, and Level IV providing the highest level of care to
    include inpatient beds and 24-hour nursing care.  A review of Mr. Sanchez's
    medical requirements suggests that if designated to a BOP facility, he would be
    placed at a care level III facility.  This is based on his need for chronic
    anticoagulation.  Should his medical condition deteriorate during confinement, he

may be transferred to one of the medical referral centers (care level IV) facilities operated by the BOP.

7.  The BOP has care level III facilities for each security level.  All of the BOP detention facilities are located in areas with substantial medical resources in the community, and are capable of providing that level of care for a short stay.  Care level III minimum security facilities include the camps at Devens, Massachusetts; Butner, North Carolina, and Terre Haute, Indiana.  Other care level III facilities with greater security are also available for those inmates who are not camp eligible.

8.  The Bureau of Prisons currently operates six Care Level IV facilities:

    Federal Medical Center, Devens, Massachusetts

    Federal Medical Center, Butner, North Carolina

    Federal Medical Center, Lexington, Kentucky

    Federal Medical Center, Carswell (Fort Worth) Texas (for women only)

    Federal Medical Center, Rochester Minnesota

    U.S. Medical Center for Federal Prisoners, Springfield, Missouri.

Each of these facilities is considered "administrative", meaning that each has multiple missions and houses inmates of multiple security levels.  Thus, minimum security level inmates in these facilities are subjected to more rigorous security procedures than they would experience in a minimum security (camp) setting.  In addition, they live and interact with inmates with significantly greater histories of criminal activity, including histories of violence.

POTENTIAL DELAY IN PLAN OF CARE

9. Mr. Sanchez's physician has indicated that Mr. Sanchez requires revascularization of one side of his heart.  Because BOP detention facilities primarily house inmates on a relatively short term basis while they complete court appearances or are awaiting designation and transfer to a longer term facility, extensive medical intervention is usually not initiated if it is medically acceptable to wait until the inmate is either released or transferred to his designated facility.  This helps to ensure continuity of care and prevents delay of transfer for medical reasons if the inmate is in the middle of a major medical initiative at the time another, long term facility is designated. In Mr. Sanchez's case, this may mean that the revascularization recommended by his physician may be postponed until he is either released or transferred to another BOP facility.  It is noted that the medical records from BOP indicate that there is an intention to obtain a consultation with a contracted cardiologist, presumably, at least in part, to determine if that intervention can be delayed or is medically mandatory during his stay at the detention facility.

MORE LIMITED SCOPE OF CARE AND ACCESS TO MEDICAL SPECIALISTS

10. Attachment #2 contains an overview of the structure of health care in the Bureau of Prisons.  While the Bureau of Prisons seeks to provide medically necessary care for its inmates, it may decline to provide all medically appropriate care.  This limited scope of care applies to medications, as well as evaluations and

interventions, and represents a more limited scope than is available to him in the community.

11. Similarly, in the community, Mr. Sanchez may self refer to a medical specialist or, if concerned, may directly contact a medical specialist such as a cardiologist, endocrinologist, or pulmonologist.  While the Bureau of Prisons facilities typically have a number of medical specialists available under contract provisions, individual access to those clinicians is limited by an administrative policy that requires multiple levels of review.  Recent changes to BOP practices have reduced the number of inmates who receive medical trips into the community to see medical specialists by approximately 10%.

CHRONIC CARE

12. Chronic care clinics are a computerized scheduling device designed to ensure that inmates with chronic conditions are seen by a clinician on a regular basis to monitor specific conditions and provide changes to care as needed.  While in custody of the BOP, Mr. Sanchez has been assigned to chronic care clinics for cardiac, diabetes, endocrinology, and hypertension.  Unfortunately a February 2008 audit conducted by the Inspector General of the Department of Justice, found that in over 18% of the BOP facilities inspected, inmates in chronic care clinics "were not monitored as required." [1] In a correctional setting, there may be any number of reasons for the required monitoring to fail, such as inmate transfers, unavailability of consulting specialists, or security requirements.

---

[1] "Federal Bureau of Prisons' Efforts to Manage Inmate Health Care, Audit Report 08-08, Office of the Inspector General, Department of Justice, Audit Division, February 2008.

However, while chronic care clinics appear to provide the required monitoring the majority of the time, enrollment in such a clinic does not assure the monitoring will be provided in all cases.

13. The OIG report indicates similar difficulties with meeting internal targets for the control of blood pressure, with BOP failing in 21% of the quarters reported to achieve its internal goal of having 70% of inmates on hypertensive medication achieve blood pressure of 140/90 or lower.

14. Similarly, that report found that 60% of the time, fell below the BOP established target for the management of lipid levels.

15.  An additional finding in that report indicated that according to BOP data, the agency was successful in achieving its goal of managing diabetic patients 39% of the time.

16. It should be noted that there are multiple reasons that blood pressure levels, glucose or lipid levels may not be achieved in any correctional setting, including the BOP.  Inmates may not be compliant with administration of medication, they may make poor nutritional choices, they may fail to achieve exercise or activity goals, or, they may be transferred to different housing units or facilities and experience disruption of care, or they may miss appointments and subsequently not receive adequate follow-up and monitoring.  While failure to achieve moderate internal goals for hypertension management is not an indictment of the health care delivery system of the BOP, it does make clear the challenges of managing a complex chronic disorder in a correctional environment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Milledgeville, Georgia, on Dec 2. 2015

PHILLIP S. WISE

**ATTACHMENT #1**
**Resume for**

Phillip Steven Wise
140 Parham Rd. N.W.
Milledgeville, Georgia 31061
Phone: 478-968-7907
Cellphone: 478-456-4904
Email: pswise@msn.com

## PERSONAL INFORMATION

Date and place of birth: December 2, 1951, Atlanta, Georgia
Family:  Married to Dianne Wise since December 28, 1974
  One son, Joshua, former Petty Officer aboard the USS Avenger, MCM-1,
Hobbies/interests: Running, bicycling, cooking, traveling, gardening

## EDUCATION

High School:
  Danbury High School
  Danbury, Connecticut
  Graduated June 1969

Undergraduate Studies:
  Emory University
  Atlanta, Georgia
  Enrolled September 1969
  Awarded BA (major in Psychology) August 1972
  Awards:  Phi Beta Kappa

Graduate School
  University of Minnesota
  Center for Research in Human Learning
  September 1972 through May 1973

  Georgia State University
  School of Education
  Enrolled 1975
  Awarded M.Ed. (Counseling and Psychological Services) March 1977

## RELEVANT EMPLOYMENT

**Bureau of Prisons**
### Psychology Technician
U.S. Penitentiary
Atlanta, Georgia
March 1977-September 1978
Major Duties: Administration of psychological assessment instruments; collection, analysis and organization of material for completion of forensic evaluations; group and individual therapy; development and delivery of counselor training; general correctional duties.

### Case Manager
U.S. Penitentiary
Atlanta, Georgia
September 1978-February 1981
Major Duties: Overall management of the cases of 250 federal convicted felons, to include reception; coordination with courts and pre-trial services; sentence monitoring; development of individual program plans; release planning; coordination with post release services.

### Case management Coordinator
Federal Correctional Institution
El Reno, Oklahoma
February 1981- February 1983
Major Duties: Coordination of activities of 8 casemangers, development and implementation of local policy regarding inmate management; advise Warden about case management policy; coordinate institution activities with U.S. Parole Commission; coordinate activities related to Interstate Agreement on Detainers, International transfer of inmates, and extradition issues.

### Drug Abuse Treatment Unit Manager
Federal Correctional Institution
Fort Worth, Texas
February 1983-October 1983
Major duties: Management of a comprehensive, residential drug treatment unit for 200 convicted federal felons; supervision of clinical psychologist, casemanagers, counselors, correctional officers and support staff; general correctional responsibilities.

### Instructor
Bureau of Prisons Staff Training Academy
Federal Law Enforcement Training Center (FLETC)
Brunswick, Georgia
October 1983-April 1985

Major duties: Instructing new Bureau of Prisons employees in firearms, self-defense, and policy; development and implementation of practical exercises for new employees; development of computer based instruction programs; firearms instruction for staff from other federal law enforcement agencies.

**Assistant Regional Administrator for Correctional Programs**
North Central Regional Office
Bureau of Prisons
Kansas City, Missouri
April 1985 – October 1986
Major Duties: Assisted the Regional Administrator in the evaluation of correctional programs in the 15 correctional facilities located within the North Central Region; management of inmate pay programs within the region; coordination of activities of the U.S. Parole Commission within the region.

**Regional Administrator, Correctional Programs**
North Central Regional Office
Bureau of Prisons
Kansas City, Missouri
October 1986 – April 1988
Major Duties: Provided oversight of correctional programs (including unit management, case management, inmate performance pay, monitoring of disruptive groups, placement of newly sentenced inmates, separation of gang members, placement of federal inmates in state systems and receipt of state inmates in federal facilities), coordination of parole hearings and releases, coordination of release planning and coordination with offices of U.S. Probation, monitoring of interstate agreement on detainers, and coordination of movement of inmates.

**Executive Assistant, Correctional Programs Division**
Central Office (Headquarters)
Bureau of Prisons
Washington, D.C.
April 1988 – May 1989
Major Duties: Provided administrative assistance to the Assistant Director of the Bureau of Prisons who was responsible for all correctional programs, including community corrections, case management, unit management, chaplaincy programs, psychology services, and custody and security. Managed transfer of inmates to and from other countries, working with the Department of State to administer international treaties, managed covert operations in conjunction with the Office of Enforcement Operations, Department of Justice.

**National Administrator, Correctional Programs Branch**

Central Office (Headquarters)
Bureau of Prisons
Washington, D.C.
May 1989 – June 1990

Major Duties: Responsible for development of agency wide policy governing correctional programs, including case management, unit management, and management of disruptive groups.  Oversight of programs agency wide in those areas, including a program of regular institution audits.  Management of national program for the placement of Mariel Cubans and repatriation of those eligible, in conjunction with the Department of Justice, Department of State, Immigration and Naturalization Service and St. Elizabeth's Hospital.  Participation in the development of administration social policy, including sentencing, legislative initiatives, and probation and parole policies.

**Executive Associate Warden**

Federal Correctional Institution
Lexington, Kentucky
June 1990 – July 1991

Major Duties: Responsible for all operational areas of a major correctional facility with both male and female populations and a significant medical mission.  Included direct responsibility for budget development and execution, facilities management, food service, health services, personnel, and training.

**Deputy Assistant Director**

Bureau of Prisons
Central Office (Headquarters)
Washington, D.C.
July 1991 – June 1994

Major Duties: Responsible for policy development and oversight of agency activities in information management and technology, research and evaluation, security technology, and international affairs.  Oversaw operations of agency information management development, including expansion of legacy system and development of agency wide local and wide area networks, the migration to distributed data bases, and integration of systems with other components of the criminal justice system.  Worked collaboratively with U.S. Marshal's Service and Immigration and Naturalization Service to implement a joint automated booking system as a demonstration project in the Vice President's initiative to reinvent government.  Participated regularly with Department of Justice and other agency officials in the development of administration policies for the Department and White House regarding criminal justice issues, including sentencing and alternatives to incarceration, probation and parole policies, legislative initiatives and assessment of impact of legislative proposals.  Participated in briefings of members of Congress, federal judges, and administration officials.  Coordinated international assistance in corrections with Department of State and Department of Justice.

**Warden**

      Federal Prison Camp
      Alderson, West Virginia
      June 1994 – September 1996
      Major Duties: Responsible for the overall administration of a major prison camp for federal female offenders, including all operational areas such as custody, financial management with a budget of $20 million, facilities management, personnel and food service, as well as program areas such as unit management, case management, chaplaincy and psychology services, education, drug abuse treatment and vocational training programs.  Of particular note were programs specifically designed for pregnancy, childbirth, and parenting.

**Warden**

      Federal Medical Center for Prisoners
      Rochester, Minnesota
      September 1996 – March 1999
      Major Duties: Responsible for the overall administration of a complex medical facility for federal prisoners, including the highest levels of inmate custody, all operational areas and program areas, an annual budget of $45 million, and management of contractual relationship with the Mayo Clinic.  Management of medical and surgical inpatient and outpatient programs and populations, and in-patient, out patient and forensic mental health programs and populations.  Responsible for ensuring compliance with all federal health care laws and regulations, ethical medical decision making, and accreditation by external health care review organizations.  Responsible for coordination of activities with other components of state and federal criminal justice components, including courts, probation and parole agencies, local, state and federal law enforcement organizations and other Department of Justice components.  Participated in the development of health care policies for the Bureau of Prisons.  Member of the U.S. Senior Executive Service.

**Assistant Director of the Federal Bureau of Prisons with responsibility for Health Services Division**

      Federal Bureau of Prisons
      Central Office (Headquarters)
      Washington, D.C.
      March 1999 – February 2, 2002
      Major Duties:  Responsible for agency wide programs in health services, food service, and safety, including policy development, integration of services across 93 institutions and 7 major medical referral centers, and oversight of those programs in each facility. Management and oversight of $500 million annual health services/food service

budget.  Participate as one of 15 members of the agency Executive Staff that makes major agency policy and personnel decisions and collectively directs operations of the agency components.  Provide briefings to members of Congress and testimony at relevant Congressional hearings, provide briefings to senior administration officials and participate in the development of national social policies related to corrections, correctional health care, public health, post release services, and legislative initiatives. Member of the U.S. Senior Executive Service.

**Medical Development International**
**822 Highway A1A North, Suite 310**
**Ponte Vedra Beach, Florida  32082**

> **Vice President, Client Services**
> December 1, 2003 to September 30, 2005

Medical Development International (MDI) is a medical service organization that arranges for specialty health care for inmates in federal, state, local, and private correctional facilities.  Through contractual arrangements with providers and correctional facilities, MDI assembles provider networks, schedules appointments, adjudicates bills and provides fund control assistance.  Major duties include participating in development of company policies and strategies, oversight of operations, and intervention on behalf of clients in contract management.

**Consultant**
**140 Parham Rd. N.W.**
**Milledgeville, Georgia 31061**
**478-968-7907**

**September 30, 2005 to Present**

Currently serve as consultant regarding prison health care with focus on Federal Bureau of Prisons.  I have provided declarations, affidavits and/or testified in over 30 cases, generally during the sentencing phase,  in the following Federal Judicial Districts: Central District of California, Eastern District of California, Southern District of New York, Maryland, Southern District of Florida, Colorado, Eastern District of Kentucky, District of Puerto Rico, Eastern District of Pennsylvania, Western District of Arkansas, Northern District of Ohio, and Middle District of Tennessee.

**ATTACHMENT #2**
**Structure of Health Care in the Bureau of Prisons**

## STRUCTURE OF BOP HEALTH CARE SYSTEM

Each Bureau of Prisons Health Services Unit includes health care providers. They are, the Clinical Director, staff physician, mid-level practitioners and ancillary staff such as pharmacists, radiology technicians, lab technicians. The primary health care of the inmates is provided primarily by the mid-level practitioners (physician assistants, nurse practitioners, or unlicensed foreign medical graduates) under the supervision of a staff physician. These staff physicians are generally family practice or internal medicine specialists, and control an inmate's access to specialty medical care and review any recommendations made by medical specialists to determine whether they are within the scope of services and policy of the Bureau of Prisons before implementation.

In order for an inmate to receive care or treatment by a specialist, including physical therapy, the mid level practitioner would have to identify the inmate's medical problem and alert the staff physician who would then decide whether to refer the inmate to a specialist if one is available. If the staff physician determines that a referral to a specialist is warranted for a non-emergency condition, such as physical therapy, that referral must be approved by the Utilization Review committee. The Utilization Review Committee is composed of the Clinical Director, Health Services Administrator, Medical Trip Coordinator, health care providers, Director of Nursing (if applicable) and a chaplain or social worker.

These committees typically convene every two weeks to consider the non-emergency referrals.  The intent of these committee reviews is to ensure that services outside the scope of those defined in policy **are not provided** and to establish an initial assessment of priority for the recommended intervention. Recently, the Bureau of Prisons has modified this procedure to require utilization review at the Regional Office Level, and as a result, the number of escorted trips for inmates to see medical specialists in the community has been reduced by 10%.

While there is no certainty that a utilization review committee will approve a specific recommendation for treatment, so long as the recommended intervention falls clearly within the category of "medically necessary – non-emergent", it is likely to be approved.  Those that are within the category of "medically acceptable – not always necessary" are far less likely to be approved by the committee.  Some institutions assign an initial priority for approved consultations/interventions using a numeric system (where 1 requires attention within one week, a priority 2 requires attention within 2-4 weeks, and a  priority 3 can be delayed for a month or more), while others use a color code with similar requirements.

The Bureau of Prisons seeks to obtain medical specialty care for its inmates through contracting with local hospitals.  However, contracts with hospitals do not necessarily include services of specialty physicians.  In fact, each facility of the Bureau of Prisons uses a variety of procurement practices to establish agreements with both hospitals and individual physicians and other medical specialists for specialty care.  The success of establishing those agreements depends on the

availability of any particular medical specialist or facility in the community in which the prison is located, the willingness of that provider or facility to travel to the prison and subject him/herself to the security requirements for entrance and the constraints of treating individuals in prison, the willingness of that provider to see inmates in his office/practice/facility, and increasingly significantly, the ability of that specialty provider to obtain medical malpractice insurance when his practice includes inmates. The refusal of many malpractice insurers to cover practices that include inmate patients severely limits the number of specialty providers willing to treat inmates. The Bureau of Prisons does not indemnify contract medical specialists who treat inmates.

The Bureau of Prisons provides five major levels of care that define the agency's "scope of services. These levels are:

<u>Medically Necessary – Acute or Emergent</u>. Medical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life threatening.

<u>Medically Necessary – Non-Emergent</u>. Medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of: serious deterioration leading to premature death; significant reduction in the possibility of repair later without present treatment; or significant pain or discomfort which impairs the inmates participation in activities of daily living.

Medically Acceptable – Not Always Necessary.  Medical conditions which are
considered elective procedures, when treatment may improve the inmate's
quality of life.

Limited Medical Value.  Medical conditions in which treatment provides little or
no medical value, are not likely to provide substantial long-term gain, or are
expressly for the inmate's convenience.  Procedures in this category are
usually excluded from the scope of services provided to Bureau inmates.

Extraordinary.  Medical interventions are deemed extraordinary if they affect the
life of another individual, such as organ transplantation, or are considered
investigational in nature.[2]

In order for an inmate to be seen by a medical specialist such as a cardiologist or
neurologist outside the facility for a non-emergency condition, an escorted trip
must be approved and arranged in advance.  The number of correctional officers
required for each medical escorted trip ranges from one to over five, depending on
the characteristics of the inmate involved.  Because of staffing limitations, a
facility will typically schedule a limited number of medical escorted trips each
day, and generally, the number of inmates requiring such trips exceeds the
number approved daily.  As a result, Bureau of Prisons medical staff, generally
the Clinical Director, establish priorities to determine which inmates should fill
the limited number of escorted trip "slots" available.  These are clinical decisions
based on the Clinical Director's assessment of acuity.  Thus, while an inmate may

---

[2]   Bureau of Prisons Program Statement P6031.03, Patient Care, August 23, 2012.

have received medical approval for specialty consultation/intervention, the delivery of that care depends heavily on the number of escorted trips available and the acuity of his condition.  The likelihood that an inmate will receive regular medical escorted trips for medical specialist consultation over an extended period of time is diminished in light of these logistical variables.  It is most likely that at some point his care, even if approved by the Utilization Review Committee will be interrupted as he is displaced for one of the escorted trip "slots" by inmates with more acute needs.

It is likely that the Bureau of Prisons will have access to the services of medical specialists that most inmates will require.  In larger or higher security facilities, the wait for an approved outside consultation may be extensive, based on limited escort staff.  In some instances, medically appropriate-non emergent appointments (specifically orthopedics) have been delayed for months, up to a year after the initial recommendation for consultation.  Should such consultation occur, any intervention/treatment suggested by the medical specialist is considered a recommendation subject to the review and approval of the institution Clinical Director in compliance with the scope of services defined by agency policy and the national formulary.  It is not unusual for an institution Clinical Director to decline to pursue a recommendation made by a consulting specialist, particularly if that recommendation includes intervention that is seen as medically acceptable – not always necessary or includes a non-formulary medication.